IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAMES W. ROBINSON,                                    3:14-CV-1736-PK

                                                     OPINION AND
                                                     ORDER

                    Plaintiff,

v.


CHARTER PRACTICES INTERNATIONAL
LLC, MEDICAL MANAGEMENT
INTERNATIONAL, INC., and MMI
HOLDINGS, INC.



                    Defendants.
_____

PAPAK, Magistrate Judge:

        Plaintiff James W. Robinson filed this action against defendants Charter Practices

International LLC ("CPI"), Medical Management International, Inc. ("MMI"), and MMI

Holdings, Inc. ("MMIH"), in the Chancery Court of Knox County, Tennessee, on September 24,

Page 1 - OPINION AND ORDER

2014. Defendants removed Robinson's action to the United States District Court for the Eastern District of Tennessee on October 13, 2014. On the stipulation of the parties, Robinson's action was transferred to this court effective October 31, 2014. On December 18, 2014, Robinson amended his complaint in this court.

By and through his amended complaint, Robinson alleges that he purchased a veterinary hospital franchise from the defendants in 2004, and that defendants subsequently improperly refused to renew the parties' franchise agreement when its original term expired in 2014. Robinson alleges defendants' liability for breach of contract in three separately pled counts (one of which is pled as a "count" of breach of contract, one of which is pled as a "count" of promissory estoppel, and one of which is pled as a "count" of declaratory judgment that a provision of the parties' 2004 franchise-purchase agreement is unenforceable), for breach of the implied covenant of good faith and fair dealing (pled as an additional "count" of the breach of contract claim), and for intentional interference with economic relations, and seeks disregard of defendants' corporate formalities, this court's declaration that a covenant not to compete with defendants during the term of the parties' franchise-purchase agreement is unenforceable as a matter of law, not less than $2 million in economic damages, $10 million in punitive damages, and/or specific performance of defendants' purported contractual obligation to renew the parties' franchise agreement for an additional term of five years. This court has subject-matter jurisdiction over Robinson's action pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court is defendants' motion (#31) to dismiss Robinson's claims or, in the alternative, to strike his prayer for monetary damages. I have considered the motion, oral

Page 2 - OPINION AND ORDER

argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, defendants' motion to dismiss is granted in its entirety, each of Robinson's claims is dismissed with prejudice, and defendants' alternative motion to strike is denied as moot.

## LEGAL STANDARD

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id., quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009), *citing Iqbal*, 129 S. Ct. at 1949.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the

light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007).

Moreover, the court "presume[s] that general allegations embrace those specific facts that are

necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994),

*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however,

accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v.*

*Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## INCORPORATION BY REFERENCE

As a preliminary matter, I note that Robinson attached six documents as exhibits to his

complaint as filed in the Chancery Court of Knox County, Tennessee, none of which appear as

exhibits to his currently operative complaint as amended in this court. The parties appear to

agree (and, following analysis of Robinson's claims, I so find) that two of those six documents

underlie Robinson's claims in significant part, namely a Charter Practice Agreement dated

August 16, 2004, executed by CPI, Robinson, and a third party (*see* Docket No. 1, Exh. 1, 151-

198) and a letter from CPI to Robinson dated November 25, 2013 (*see* Docket No. 1, Exh. 1,

283-284). Moreover, Robinson's amended complaint refers extensively to both documents, and

in addition quotes extensively from the letter of November 25, 2013. In consequence, I find that

under the Ninth Circuit's doctrine of incorporation by reference the court may properly consider

both the Charter Practices Agreement of August 16, 2004, and the letter of November 25, 2013,

without converting defendants' motion into a motion for summary judgment. *See, e.g.,*

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Marder v. Lopez*, 450 F.3d

445, 448 (9th Cir. 2006); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). In

connection with the analysis that follows, I have disregarded the other documents filed as

exhibits to Robinson's complaint as originally filed, all other evidence outside Robinson's currently operative pleading, and all proffered argument premised on any such evidence.

## FACTUAL BACKGROUND

### I.   The Parties

Plaintiff Robinson is a resident of Carter County, Tennessee. Robinson is a doctor of veterinary medicine, and practices as a veterinarian.

Defendants CPI, MMI, and MMIH are corporate entities organized under the laws of the State of Delaware, each with its principal place of business in Portland, Oregon. MMIH is the corporate parent of both CPI and MMI. Defendants developed and own a business method referred to by the parties as the "Banfield System" for the operation of full-service veterinary hospitals. Defendants own over 850 veterinary hospitals worldwide and, in addition, franchise veterinary hospitals (each, a "Banfield Pet Hospital") to independent veterinarians.

### II.   Robinson's Allegations Regarding the Parties' Dispute[1]

Since approximately 1992, Robinson has owned and operated the Robinson Animal Hospital, a veterinary practice comprised of two clinics located in and around Johnson City, Tennessee. On October 25, 2002, Robinson applied to become a franchisee of a Banfield Pet Hospital, to be located in Johnson City, Tennessee. By and through his application and cover letter, Robinson advised defendants that he owned and operated the Robinson Animal Hospital and intended to continue doing so in the event he became a Banfield Pet Hospital franchisee.

On or around March 31, 2003, CPI and Robinson (together with Robinson's wife, Kim

---

[1]   Except where otherwise indicated, the following recitation constitutes my construal of the allegations of Robinson's complaint and of the matters incorporated by reference therein in the light most favorable to Robinson.

Robinson) entered into a Charter Practice Agreement (the "2003 Franchise Agreement") pursuant

to which Robinson purchased the Johnson City Banfield Pet Hospital franchise (the "Johnson

City franchise") from the defendants for a term of ten years.  Although the 2003 Franchise

Agreement contained a provision expressly prohibiting Robinson from owning, operating, or

being employed by any competing veterinary hospital either during the term of the agreement or

(under some circumstances) for a period of two years following its expiration, by letter dated

March 7, 2003, and signed by both CPI and Robinson, the parties modified their agreement to

state that Robinson's ownership and operation of the Robinson Animal Hospital would not be

deemed to violate that provision.  The 2003 Franchise Agreement further provided a mechanism

by and through which the parties could elect to renew their agreement for an additional term

following expiration of the original ten-year term.

Approximately two years later, Robinson and a partner, veterinarian Holly McLain,

applied for a second Banfield Pet Hospital franchise to be located in Knoxville, Tennessee.  Once

again, Robinson advised defendants in connection with his application that he was the owner and

operator of the Robinson Animal Hospital.  CPI granted Robinson and McLain's application, and

on or around August 16, 2004, CPI, Robinson, and McLain entered into a Charter Practice

Agreement (the "2004 Franchise Agreement" filed at Docket No. 1, Exh. 1, 151-198) pursuant to

which Robinson purchased the Johnson City Banfield Pet Hospital franchise (the "Knoxville

franchise") from the defendants for a term of ten years from the date the franchise opened for

business.  *See* 2004 Franchise Agreement, § 2.2.  The agreement required Robinson to pay

defendants an initial payment of $50,000 and monthly payments of 9.0% of monthly revenue for

each of the last nine months of the first year of operations, of 11.5% for each month of the

Page 6 - OPINION AND ORDER

second year of operation, of 13.0% for each month of the third year of operation, of 14.5% for

each month of the fourth year of operation, and of 15.0% for each subsequent month of

operation. *See id.*, §§ 3.1, 3.2. Robinson's rights as a franchisee were expressly conditioned on

his achievement of specified quarterly and annual revenue benchmarks. *See id.*, § 3.5. The 2004

Franchise Agreement required that Robinson comply with the terms and conditions of

defendants' Banfield System in the operation of the franchise, *see id.*, § 6.1, and that either

Robinson or a manager approved by the defendants devote full-time efforts to the operation

thereof, *see id.*, § 6.2.

The 2004 Franchise Agreement contained provisions expressly prohibiting Robinson

from owning, operating, or being employed by any competing veterinary hospital at any time

during the term of the agreement (the "original-term non-competition provision"), *see id.*, §

6.20.1(a), or for a period of two years following its expiration where such hospital was within

five miles of the franchise location (the "post-termination non-competition provision"), *see id.*, §

6.20.2. It does not appear that the parties expressly modified that provision as they did with the

analogous provision of the 2003 Franchise Agreement, but as noted above CPI was on notice at

the time it executed the 2004 Franchise Agreement that Robinson owned and operated the

Robinson Animal Hospital and intended to continue doing so while owning and operating the

Knoxville franchise. At no time during the original ten-year term of the 2004 Franchise

Agreement did defendants make any attempt to enforce Sections 6.20.1(a) or 6.20.2 in

connection with Robinson's ownership and operation of the Robinson Animal Hospital.

The 2004 Franchise Agreement contained a provision that the franchisees could renew

the agreement for "one (1) additional term of five (5) years," provided certain specified terms and

Page 7 - OPINION AND ORDER

conditions were met. *Id.*, § 8.1. In the event the franchisees elected to seek renewal of the parties' agreement, they were required to provide notice of their intent to renew fewer than 360 and more than 180 days prior to the expiration of the agreement's ten-year term, *see id.*, § 8.1.2, and to pay a renewal fee of $15,000, *see id.*, § 8.1.5. The agreement provided that the franchisees would not have the right to renew the agreement if at that time "there exist[ed] any uncured breach" thereof, or if, in the exclusive good-faith discretion of CPI, the franchisees had failed to "satisfactorily comply" with the agreement during its initial term. *Id.*, § 8.1.1. In addition, CPI could refuse to renew the agreement based on its decision either to terminate its franchise program generally or in the franchisees' market area in particular, or for other, unspecified reasons. *See id.*, § 8.1.2. Renewal of the agreement would be subject to the franchisees' execution of an agreement "substantially on the terms and conditions of CPI's then-current form of Charter Practice Agreement." *Id.*, § 8.1.4. The 2004 Franchise Agreement expressly provided that "[t]he terms of [such] renewal agreement may differ from the terms of th[e 2004 Franchise] Agreement . . . ." *Id.*, *see also id.*, § 8.1.2 (referencing the possibility that requirements "relating to the image, appearance, operation, furnishing, equipping and stocking" of a franchise could likewise change in connection with such a renewal). The agreement expressly provided CPI the right to treat the franchisees' failure to execute such a renewal agreement within thirty days after delivery thereof as an election by the franchisees not to renew. *Id.*, § 8.1.4.

In the event of the expiration of the 2004 Franchise Agreement, CPI had the option either to permit a franchisee to continue operating the formerly franchised veterinary hospital after modifying it to distinguish it from a Banfield Pet Hospital or to purchase the hospital's equipment and continue operating the facility as a defendants-owned Banfield Pet Hospital. *See id.*, §§ 8.5,

8.5.1-8.5.7. In the event CPI elected to purchase the hospital's equipment, CPI and the franchisee would attempt to agree upon purchase price or terms within ten days following expiration of the agreement or, upon failure to do so, hire independent appraisers to determine the fair market value of the equipment at issue. *See id.*, § 8.5.7.

The 2004 Franchise Agreement expressly provided that, before a franchisee could sell any ownership interest in the franchise, the franchisee was required to provide CPI with a right of first refusal to purchase that ownership interest. *See id.*, § 9.5.  Moreover, any transfer of a franchisee's interest in a franchise was expressly conditioned on CPI's prior informed and written consent to the transfer. *See id.*, § 9.2.  The agreement provided that CPI had the right to withhold its consent to any such transfer "on any grounds CPI deem[ed] sufficient in its absolute discretion," *id.*, § 9.2.1, and that CPI had the right to condition any such transfer on, *inter alia*, its waiver of its right of first refusal under Section 9.5, *see id.*, § 9.2.1(c).

The 2004 Franchise Agreement additionally contained a provision that its terms could not be modified except by and through a written agreement signed by the parties. *See id.*, § 11.7. The agreement provided that it was to be governed by Oregon law, and that any legal proceedings relating to its provisions must take place in Portland, Oregon. *See id.*, § 11.10.  The agreement further provided, in majuscule font, that:

> UNDER NO CIRCUMSTANCES WILL CPI BE LIABLE TO [THE FRANCHISEES] OR ANY OTHER PERSON OR ENTITY FOR SERIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, LOSS OF GOOD WILL OR BUSINESS PROFITS, OR EXEMPLARY OR PUNITIVE DAMAGES.

*Id.*, § 11.13.

The Knoxville franchise opened for business on or around November 13, 2004.  In 2008,

Robinson purchased McLain's interest in the Knoxville Franchise for $75,000, and thereafter acted as the sole franchisee under the 2004 Franchise Agreement.

In 2012, CPI notified Robinson of its decision to terminate its franchise program in the Johnson City market area. On that basis, the parties did not renew the 2003 Franchise Agreement when its term expired as of March 30, 2013.

In 2013, Robinson provided CPI with notice of his intent to renew the 2004 Franchise Agreement. On or around November 25, 2013, CPI advised Robinson by letter (the "November 25, 2013, Letter" filed at Docket No. 1, Exh. 1, 283-284) of its decision to deny the requested renewal. The November 25, 2013, Letter stated *inter alia* as follows:

> Beginning in mid-2012, CPI notified [Robinson] through a series of in-person, telephone and written communications that CPI would not renew the [2004 Franchise Agreement] unless [Robinson] divested [him]self of any and all interests in [his] non-Banfield veterinary hospitals, including but not limited to any and all interests [he might] have in the Robinson Animal Hospital[] . . . . Specifically, CPI notified [Robinson] of the risk of nonrenewal of the [2004 Franchise Agreement] in the following nonexclusive list of communications: (1) conversations with Vincent Bradley near the time of the Johnson City [franchise] closing and briefly at the 2013 National Field Leadership conference; (2) telephone conversation with Chris Stinnett in June 2103; (3) telephone conversation with Chris Stinnett and Troy Bischoff in August 2013; (4) Charter State of the Practice webinar on August 28, 2013; (5) letter from CPI sent by email on September 6, 2013; and (6) email from Chris Stinnett on October 25, 2013, reaffirming CPI's position. On September 12, 2013, [Robinson] stated in an email to Kelly Orfield that [he did] not plan to sell [his] non-Banfield hospital(s). As a result of this and as further discussed in this letter, CPI will not renew the [2004 Franchise Agreement].

> Section 7.21.1(a) of the current version of CPI's Charter Practice Agreement prohibits a [franchisee] from "owning, operating, maintaining, managing, participating or engaging in, being . . . employed at or working at, advising, assisting, investing in, or having any interest in any other veterinary hospital or related veterinary business or facility" during the term of the Charter Practice Agreement. The 2014 version of the [Charter Practice Agreement], which you would be required to sign as a condition of renewal, will include a substantially similar version of this provision.

> There are a number of reasons CPI does not allow [franchisees] to be involved with non-Banfield veterinary businesses. The primary reason is that CPI believes the quality of preventive care and client experience directly correlates to an owner's full time efforts in the [franchised] Hospital. In addition, [defendants'] operating systems, policies, procedures and protocols are confidential and proprietary. To maintain its competitive advantage, CPI cannot allow a [franchisee] who is privy to the continual innovation in operational improvements and efficiencies to have the opportunity to apply those innovations to a business which competes with [defendants]. For this reason, CPI cannot allow [Robinson] to continue to operate a Banfield Hospital, and will not renew the [2004 Franchise Agreement].

November 25, 2013, Letter, 1-2.

After being informed that CPI would not renew the 2004 Franchise Agreement, Robinson attempted to sell the Knoxville franchise to a *bona fide* purchaser with no interest in any other veterinary hospital or related business, but defendants refused to approve the sale. On or around November 12, 2014, defendants took over operations of the Knoxville franchise.[2] At that time, the Knoxville franchise was fully operational, fully staffed, fully equipped, and profitable. It is Robinson's position that, notwithstanding the statements made in the November 25, 2013, letter, defendants' decision to deny renewal of the 2004 Franchise Agreement was motivated by an intent to capture profits generated by the Knoxville franchise by taking over its operations and operating it directly and/or by an intent to terminate the franchise program generally.

## ANALYSIS

Defendants move for dismissal of all of Robinson's claims, and in the alternative move to strike Robinson's claims for money damages. Robinson takes the position that each of his claims has merit, and in the alternative asserts the right to replead his allegations in support of each in

---

[2] Robinson offers no allegation that he did not receive payment for the fair market value of the equipment used in operation of the Knoxville Franchise as provided under Section 8.5.7 of the parties' 2004 Franchise Agreement.

order to cure any deficiencies therein, in lieu of dismissal of his claims with prejudice.  The

parties tacitly agree – and I concur – that, pursuant to Section 11.10 of the 2004 Franchise

Agreement, Robinson's claims are governed by Oregon law.

## I.      Construal of Robinson's Claims

By and through his amended complaint, Robinson expressly alleges (i) one claim of

breach of contract, which he divides into four separately pled "counts," (ii) one claim of

intentional interference with economic relations, (iii) one claim characterized as a claim for

"specific performance" of the renewal provisions of the 2004 Franchise Agreement, and (iv) one

claim characterized as a claim for "disregard" of defendants' corporate formalities.  The

separately pled "counts" of the breach of contract claim are characterized as counts (i)(a) for

breach of the renewal provisions of the 2004 Franchise Agreement, (i)(b) for promissory estoppel

preventing defendants from "asserting that Dr. Robinson is not in compliance with the [original-

term non-competition provision] of the [2004 Franchise Agreement]," (i)(c) for breach of the

implied covenant of good faith and fair dealing, and (i)(d) for this court's declaration that the

original-term non-competition provision of the 2004 Franchise Agreement is unenforceable as a

matter of law.

Properly construed, Robinson alleges only a single breach of contract, namely defendants'

alleged breach of the renewal provisions of the 2004 Franchise Agreement.  The first pled count

of the breach of contract claim states this claim, while the second pled count (promissory

estoppel from asserting Robinson's noncompliance with the original-term non-competition

provision of the 2004 Franchise Agreement) and fourth pled count (declaratory judgment that the

original-term non-competition provision of the 2004 Franchise Agreement is unenforceable)

articulate related, alternative theories of how defendants' refusal to renew the agreement

constituted breach of the parties' agreement. The "claim" styled as a claim for specific

performance is not, properly construed, an independent cause of action (notwithstanding the

manner in which it is pled), but rather a remedy potentially available in the event Robinson

succeeds in establishing breach of the 2004 Franchise Agreement.

   The third pled count of the breach of contract claim (breach of the implied covenant of

goof faith and fair dealing), properly construed, is not premised on defendants' breach of contract

but rather is necessarily asserted in the alternative to breach of the express provisions of the

parties' agreement, and constitutes an independent (if alternative) cause of action. The

intentional interference claim is appropriately pled as a third independent cause of action. The

"claim" styled as a claim for disregard of defendants' corporate formalities is not, properly

construed, an independent cause of action (notwithstanding the manner in which it is pled), but

rather a mechanism for recovery of damages potentially available in the event Robinson succeeds

in establishing the liability of one or more defendants for award of monetary damages in

connection with any one or more of his independent causes of action.

   In the analysis which follows, I construe and address Robinson's claims in keeping with

the foregoing construction.

## II.    Robinson's "Group" Pleading of Defendants' Liability

   Defendants challenge the adequacy of Robinson's allegations in support of his claims on

the grounds that Robinson alleges all three defendants' collective participation in the misconduct

underlying his claims without differentiating among them or alleging separate grounds for the

liability of each. I disagree with the defendants that Robinson's "group" pleading of his

allegations falls afoul of the requirements of Federal Civil Procedure Rule 8(a)(2).[3]  On their

face, Robinson's allegations are sufficiently detailed to give defendants notice of the nature of

Robinson's claims and to permit them to prepare their defense (as is evidenced by the defenses

raised by and through defendants' motion to dismiss).  To the extent defendants simply disagree

with Robinson that all defendants did, as a matter of fact, participate in the complained-of

conduct, that disagreement cannot properly be resolved through a motion to dismiss, but rather

would be a matter for determination at summary judgment.  I therefore decline to grant

defendants' motion to dismiss to the extent premised on Robinson's "group" pleading.

### III.    Robinson's Breach of Contract Claim(s) (Breach of Contract Claim Counts 1, 2, and 4; Claim Styled as "Specific Performance")

Under Oregon, law, a plaintiff in a breach of contract action "has the burden to establish

the existence of a valid contract and the breach thereof."  *Pendleton Grain Growers v. Pedro,*

271 Or. 24, 28 (1975).  In addition, "[t]he rule in Oregon is that a party seeking to recover

damages for an alleged breach of contract must plead and prove either substantial performance

on his part or a valid excuse for his own failure to perform."  *Aurora Aviation, Inc. v. AAR*

*Western Skyways, Inc.*, 75 Or. App. 598, 602 (1985), *citing Wasserburger v. American Scientific*

*Chemical, Inc.*, 267 Or. 77, 82 (1973).  The parties do not dispute that the parties' 2004 Franchise

Agreement was valid and enforceable, and defendants do not take the position that Robinson

failed substantially to perform all of his obligations thereunder (except to the extent that it may

---

[3]  Rule 8(a)(2) requires that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To satisfy the requirements of Rule 8(a)(2), such a statement must give notice to the defendant of the nature of the claim at issue, and provide the defendant a fair opportunity to litigate a defense against it.  *See, e.g., Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir. 2011).

be their position that he did not perform all conditions precedent to imposing a contractual obligation on CPI to renew the agreement for an additional term). The critical question in connection with each of Robinson's various articulations of his breach of contract claim is, therefore, whether CPI's refusal to renew the Knoxville franchise for an additional five-year term in 2014 could have been in breach of any contractual obligation owed by any defendant to Robinson.

Robinson offers several related theories of breach: (i) that defendants breached the express terms of the 2004 Franchise Agreement by requiring Robinson, as a condition of renewal, to execute a form of Charter Practices Agreement that contained a provision requiring him to refrain from operating any competing veterinary hospital notwithstanding defendants' partial waiver of the analogous provision of the 2004 Franchise Agreement to permit Robinson to continue operating the Robinson Animal Hospital while operating the Knoxville franchise, (ii) that by so doing defendants breached the terms of their agreement because defendants' partial waiver of the non-competition provision of the 2004 Franchise Agreement was irrevocable as applied both to the original term of the agreement and to any renewal term thereof, (iii) that by so doing defendants breached the terms of their agreement because defendants are estopped as a matter of law from attempting to enforce any non-competition provision of any renewal agreement that would be more restrictive than the non-competition provision of the 2004 Franchise Agreement as modified by and through defendants' partial waiver thereof, and (iv) that by so doing defendants breached the terms of their agreement because the non-competition provision of the 2014 version of defendants' Charter Practices Agreement is unenforceable as a matter of law as an impermissible restriction on Robinson's right to pursue his livelihood. In the

analysis that follows, I address each of Robinson's theories.

Three of Robinson's four theories are premised on the proposition that defendants (through the actions of CPI) waived enforcement of the noncompetition provisions (Sections 6.20.1(a) and 6.20.2) of the 2004 Franchise Agreement in connection with his ownership and operation of the Robinson Animal Hospital. I agree with Robinson that CPI waived enforcement of those provisions during the entire ten-year term of the 2004 Franchise Agreement by and through its course of conduct.[4] Under Oregon law, "adults with the capacity to do so generally are free to waive a panoply of rights, statutory and constitutional, so long as the waiver is knowing and intentional." *McInnis & McInnis*, 199 Or. App. 223, 236 (2005) (citations omitted); *see also, e.g., Bennett v. Farmers Ins. Co.*, 332 Or. 138, 156-157 (2001) (noting that "waiver . . . appl[ies] broadly to any contract term" and finding waiver of contractual rights enforceable where both voluntary and unequivocal). "A contractual waiver requires the intentional relinquishment of a known right, manifested in an unequivocal manner." *McMillan v. Follansbee*, 194 Or. App. 145, 153 (2004). Even where an agreement contains a provision expressly requiring any waiver or modification of any other provision of the agreement to be in writing, any party thereto may waive any provision thereof either orally or through course of conduct. *See, e.g., Anderson v. Divito*, 138 Or. App. 272, 281 (1995); *citing Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or. 235, 241 (1993). However, where waiver is effected through course of conduct, it must be through "a clear and unequivocal act" manifesting the party's intent to waive the provision. *Id., citing Bank of Eastern Oregon v. Griffith*, 101 Or. App. 528, 534

---

[4] It is clear that the letter of March 7, 2003, constituted an express partial waiver of the non-competition provisions of the 2003 Franchise Agreement only.

(1990).  Here, CPI accepted Robinson's application for the Knoxville franchise with clear

advance notice that Robinson intended to continue owning and operating the Robinson Animal

Hospital during the term of the proposed franchise and moreover suffered Robinson to continue

owning and operating the Robinson Animal Hospital without objection and without attempting to

enforce Sections 6.20.1(a) or 6.20.2 of the 2004 Franchise Agreement in connection with the

Robinson Animal Hospital at any time during the original ten-year term of the agreement.  For

purposes of the motion now before the court, I find that this conduct constituted an unequivocal

manifestation of CPI's intent to treat Robinson's continued affiliation with the Robinson Animal

Hospital as nonviolative of the 2004 Franchise Agreement's non-competition provisions.

The first matter for the court's disposition, then, is whether CPI's partial waiver of the

non-competition provisions of the 2004 Franchise Agreement necessarily bound defendants by

operation of contract to offer a renewal agreement that likewise exempted Robinson's continued

affiliation with the Robinson Animal Hospital from its non-competition provisions.  Robinson

takes the position that the 2004 Franchise Agreement bound defendants to offer as a renewal

agreement a form of Charter Practices Agreement substantially similar (other than in its

"financial" terms) to the original agreement as modified by the parties; Robinson takes the further

position that defendants' inclusion of an unwaived non-competition provision in the 2014

renewal agreement was in violation of that obligation.

Robinson's position is not persuasive.  As noted above, the 2004 Franchise Agreement

expressly provided that "[t]he terms of [the proffered] renewal agreement may differ from the

terms of th[e 2004 Franchise] Agreement . . . ."  2004 Franchise Agreement, § 8.14.  The

agreement specified that the terms of the renewal agreement could differ in respects "*including* a

different Royalty and Service Fee and other new financial requirements," *id.* (emphasis supplied),

but did not in any sense suggest the terms could differ *only* in those respects. To the contrary,

Section 8.12 of the parties' agreement non-exhaustively recites additional respects in which the

renewal agreement might differ from the original agreement, including "requirements relating to

the image, appearance, operation, furnishing, equipping and stocking of Hospital facilities." *Id.*,

§ 8.12. Moreover, the agreement afforded CPI the express right to refuse to renew based on its

decision either to terminate its franchise program generally or in the franchisees' market area in

particular, or for other reasons not exhaustively specified in the contract. *See id.* Because the

renewal provisions of the 2004 Franchise Agreement specified that renewal would be

conditioned on Robinson's execution of "CPI's then-current form of Charter Practice Agreement"

and that the terms of that form of agreement could differ in both specified and unspecified ways

from the terms of the original agreement, CPI's insistence that Robinson execute a form of

agreement that contained unwaived non-competition provisions notwithstanding its partial

waiver of the analogous provisions of the original agreement was not in violation of the express

terms of the parties' contract. *See e.g., Fisher v. Tiffin*, 275 Or. 437, 441 (1976) ("[p]arties to a

contract can not, even by an express provision in that contract, deprive themselves of the power

to alter or vary or discharge it by subsequent agreement"). In consequence, I find that Robinson

cannot state a claim for breach premised on the theory that proffer of a renewal agreement

containing unwaived non-competition provisions violated the express terms of the parties'

agreement.

The second matter for the court's disposition is whether CPI's conduct manifesting intent

partially to waive the non-competition provisions of the 2004 Franchise Agreement effected an

irrevocable waiver applicable with equal force to the original term of the parties' agreement and to any renewal term thereof, notwithstanding CPI's notice to Robinson of not later than mid-2012 that it intended to enforce the non-competition provisions of a 2014 renewal agreement in connection with the Robinson Animal Hospital. CPI's conduct in accepting Robinson's application with knowledge that he intended to continue owning and operating the Robinson Animal Hospital during the term of the proposed franchise and in refraining from seeking to enforce the agreement's non-competition provisions as to the Robinson Animal Hospital during its original ten-year term – particularly when considered in connection with the provisions of the parties' agreement indicating that any renewal term thereof would be governed by a new written agreement the terms of which could differ from the parties' original written agreement – simply does not constitute a clear and unequivocal manifestation of CPI's intent to bind itself irrevocably to its partial waiver not merely as to the ten-year term governed by the 2004 Franchise Agreement but also as to any future term of the parties' contractual relationship governed by the contemplated future agreement. In this connection, I note moreover that as a general rule, "[a] prior course of conduct under previous contracts will not operate as a waiver of an express stipulation in a new contract," *Weyerhaeuser Timber Co. v. First Nat'l Bank of Portland*, 150 Or. 172, 195 (1934), and that Oregon law permits a party that has waived strict compliance with an express contractual term to revoke its waiver by giving reasonable advance notice of its intent to require strict compliance in the future, *see Fisher*, 275 Or. at 442 (standing for that proposition); here the operative fact is that CPI provided Robinson with approximately 18 months' notice of its intention to require strict compliance with the non-competition provisions of the parties' contemplated new agreement. Because CPI did not unequivocally manifest an intention to effect

an irrevocable waiver, because even if it had done so, it would have lacked the capacity so to

bind itself (*see Fisher*, 275 Or. at 441), and because CPI provided Robinson with reasonable

notice of its intent not to waive the non-competition provisions of the 2014 Charter Practices

Agreement execution of which was a condition precedent of its obligation to renew the Knoxville

franchise, I find that Robinson cannot state a claim for breach premised on a theory that CPI's

partial waiver was irrevocable.

The third matter for the court's disposition is whether, under all of the circumstances,

defendants could be estopped from seeking to enforce the non-competition provisions of the

2014 Charter Practices Agreement against Robinson in connection with his affiliation with the

Robinson Animal Hospital.  Robinson expressly invokes the doctrine of promissory estoppel in

support of this theory, but largely cites cases construing equitable estoppel in support of his

argument.  In the analysis that follows, I address both doctrines.

Under Oregon law, the elements of promissory estoppel are:

(1)  a promise
(2)  which the promisor, as a reasonable person, could foresee would induce
     conduct of the kind which occurred,
(3)  actual reliance on the promise,
(4)  resulting in a substantial change in position.

*Neiss v. Ehlers*, 135 Or. App. 218, 223 (1995) (internal quotation marks omitted), *quoting Bixler*

*v. First National Bank*, 49 Or. App. 195, 199-200 (1980).  "Promissory estoppel is not an

independent cause of action.  It is a substitute for consideration, and provides a basis for

enforcing a promise as a contract despite a lack of consideration, when the promisee has relied on

a promise to his or her detriment."  *Natkin & Co. v. H.D. Fowler Co.*, 128 Or. App. 311, 314

(1994), *citing City of Ashland v. Hoffarth*, 84 Or. App. 265, 270 (1987).  "The doctrine is applied

if 'injustice can be avoided only by enforcement of the promise.'" *Id.*, *quoting* Restatement of Contracts § 90 (1932). That is, promissory estoppel is a means of establishing the existence of a valid contract, and is unnecessary where the existence of an enforceable contract is established. *See id.* at 316. Effectively, then, it is Robinson's theory that CPI's partial waiver of Sections 6.20.1(a) and 6.20.2 of the 2004 Franchise Agreement constituted a promise *never* to enforce the non-competition provisions of the parties' agreement as to Robinson's affiliation with the Robinson Animal Hospital, not merely in connection with the original ten-year term of the parties' agreement but also in connection with any future renewal term thereof to be governed by a different agreement, and that this promise foreseeably induced Robinson to enter into the agreement in the expectation of fifteen rather than ten years of forbearance.

Robinson's theory is fatally flawed in two respects. First, unlike in connection with the 2003 Franchise Agreement, in connection with the 2004 Franchise Agreement CPI did not make any express promise to waive enforcement of the non-competition provisions, but rather merely refrained from enforcing them. While this course of conduct, under the circumstances, is sufficient to effect a waiver thereof, for the same reasons discussed above in connection with Robinson's theory of irrevocable waiver, it is not sufficient to imply a promise that such waiver would govern any future agreement the parties might execute. Second, the promise implied by CPI's acceptance of Robinson's application and forbearance from seeking to enforce its noncompetition provisions as to the Robinson Animal Hospital during the original ten-year term of the parties' agreement could not reasonably have been foreseen by CPI as likely to induce Robinson to believe that if he entered into the 2004 Franchise Agreement he would as a matter of course be entitled thereunder to a renewal term of five additional years during which such

forbearance would necessarily continue. To the contrary, the renewal provisions of the 2004

Franchise Agreement make clear that no franchisee thereunder could reasonably expect that *any*

particular provision of the renewal agreement would be identical to the analogous provision the

parties agreed upon in connection with the original term of the agreement, or indeed – given

CPI's express right to refuse renewal for precisely the reasons Robinson now asserts as

defendants' true motivation, namely its decision either to terminate its franchise program

generally or in the franchisees' market area in particular, or for other unspecified reasons – that

the franchise relationship would necessarily survive expiration of the initial ten-year term.

Indeed, it would affirmatively have been unreasonable, in light of the case law discussed above

establishing that "[a] prior course of conduct under previous contracts will not operate as a

waiver of an express stipulation in a new contract," *Weyerhaeuser Timber Co.*, 150 Or. at 195,

for Robinson so to have inferred from CPI's implied promise. I therefore find that Robinson's

breach claim cannot survive defendants' motion on a theory of promissory estoppel.

 As to the possibility that Robinson intends to pursue his breach claim on a theory of

equitable estoppel, the analysis follows a similar course to the identical conclusion. "To

constitute an equitable estoppel, or estoppel by conduct," under Oregon law:

> (1) there must be a false representation; (2) it must be made with knowledge of
> the facts; (3) the other party must have been ignorant of the truth; (4) it must have
> been made with the intention that it should be acted upon by the other party; and
> (5) the other party must have been induced to act upon it.

*Guardian Mgmt., LLC v. Zamiello*, 194 Or. App. 524, 530 (2004), *quoting Bennett v. City of*

*Salem et al.*, 192 Or. 531, 541 (1951). For reasons discussed above, any "representation" that

may have been inferrable from CPI's conduct could not either as a matter of reasonable

interpretation or as a matter of law have bound CPI as to any renewal term of the parties'

Page 22 - OPINION AND ORDER

agreement; because the implied representation can only have applied to the initial ten-year term of the parties' agreement, and because CPI in fact refrained from seeking to enforce the non-competition provisions of the 2004 Franchise Agreement during the entirety of its initial term, there is no sense in which such implied representation may properly be construed as false. In consequence, Robinson's breach claim cannot survive defendants' motion on a theory of equitable estoppel.

The fourth matter for the court's disposition is whether Robinson can state a claim for breach premised on the theory that the non-competition provisions of defendants' 2014 Charter Practices Agreement are unenforceable as a matter of law by virtue of imposing an impermissible restriction on Robinson's right to pursue his livelihood. While I have concerns regarding the coherence of Robinson's apparent theory that defendants' inclusion of a purportedly unenforceable provision in a form of agreement that Robinson never signed could constitute breach of contract, I need not address that issue because, for the following reasons, I conclude that the non-competition provisions of the 2014 Charter Practices Agreement are enforceable under Oregon law.

On or around November 25, 2013, CPI advised Robinson by letter that Section 7.21.1(a) of the then-current version of defendants' Charter Practices Agreement would prohibit a franchisee from "owning, operating, maintaining, managing, participating or engaging in, being . . . employed at or working at, advising, assisting, investing in, or having any interest in any other veterinary hospital or related veterinary business or facility" during any term of any franchise relationship it governed. Because Robinson advised defendants that he would not disaffiliate from the Robinson Animal Hospital to bring himself into compliance with that

provision, defendants refused to renew the Knoxville franchise when it expired in 2014.

Oregon law permits and enforces covenants not to compete, under certain conditions, but imposes restrictions on the ability of one party to a contract to restrict another party from pursuing his or her livelihood within the profession of his or her choice *following dissolution* of the employment relationship, partnership, or joint venture governed by the contract. *See, e.g.,* *McGee v. Coe Mfg. Co.*, 203 Or. App. 10, 15-17 (2005); *McCallum v. Asbury*, 238 Or. 257, 263-264 (1964); Or. Rev. Stat. 653.295. By contrast, where, as here, a covenant not to compete is applicable according to its terms only *during the term* of an employment relationship, partnership, joint venture, or like relationship, Oregon imposes only a rule of reasonableness: the restrictions must be "partial or restricted in . . . operation in respect either to time or place," they must be imposed in exchange for "good consideration," and they must be "reasonable, that is, [they] should afford only a fair protection to the interests of the party in whose favor [the covenant] is made, and must not be so large in [their] operation as to interfere with the interests of the public." *North Pacific Lumber Co. v. Moore*, 275 Or. 359, 364 (1976); *quoting Eldridge v. Johnston*, 195 Or. 379, 403 (1952). Here, it is clear that the restraints that would have been imposed by the non-competition provisions of the 2014 Charter Practices Agreement would have been partial or restricted in operation in respect to time, in that they would not have persisted past the expiration of the parties' agreement, and equally clear that they would have been imposed in exchange for good consideration, namely renewal of the parties' franchise agreement for a period of five additional years. Moreover, I find that the restriction would as a matter of law have been reasonable, in that it was calculated to require Robinson, as defendants' franchisee, to devote his full-time professional efforts to the Knoxville franchise rather than permit him to devote some of

his professional efforts to a competing business enterprise. In addition, the restriction prohibiting Robinson from professional affiliation with a competing business enterprise during the term of his franchise would prevent him from using defendants' proprietary procedures and protocols for the benefit of the competing enterprise while still affiliated with defendants. Under those circumstances, Oregon law would enforce the non-competition provisions of the 2014 Charter Practices Agreement. In consequence, I find that Robinson is not entitled to this court's declaration that those provisions were unenforceable as a matter of Oregon law, and that Robinson cannot state a claim for breach premised on those provisions' unenforceability.

Because Robinson cannot state a claim for breach of contract premised on any of his proffered legal theories, it follows that his so-styled "claim" for specific performance of CPI's contractual obligations to him necessarily fails. Specific performance is merely a remedy for breach of contract, and does not constitute a cause of action. *See, e.g., Combs v. Loebner*, 315 Or. 444, 450 (1993).

Because the foregoing analysis flows from consideration of the express terms of the parties' contract and material written communications, which speak for themselves and are incorporated by reference into Robinson's complaint, the deficiencies identified above cannot be cured by amendment of Robinson's pleading. As a result, it would be futile to grant Robinson leave to amend, and Robinson's breach of contract claim (the first, second, and fourth counts of his first enumerated claim for relief and the entirety of his third enumerated claim for relief) is dismissed with prejudice.

## IV.   Robinson's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Breach of Contract Claim Count 3)

Robinson takes the position that defendants violated the covenant of good faith and fair

dealing implied in the parties' 2004 Franchise Agreement by conditioning renewal thereof on Robinson's agreement to be governed by a non-competition provision that would require him to disaffiliate from the Robinson Animal Hospital notwithstanding defendants' waiver of the analogous provision of the agreement governing the initial ten-year term of the franchise relationship. Under applicable Oregon jurisprudence, it is well settled that:

> the law imposes a duty of good faith and fair dealing with respect to all contracts to facilitate performance and enforcement of the contract where it is consistent with and in furtherance of the agreed-upon terms of the contract or where it effectuates the reasonable contractual expectations of the parties.

*Brown v. American Prop. Mgmt. Corp.*, 167 Or. App. 53, 63 (2000) (internal quotation marks omitted), *quoting Sheets v. Knight*, 308 Or. 220, 233 (1989). Moreover, "it is only the objectively reasonable expectations of parties that will be examined in determining whether the obligation of good faith has been met." *Tolbert v. First Nat'l Bank*, 1991 Or. 312 Or. 485, 494 (1991). However, it is also settled Oregon law that:

> the implied duty of good faith and fair dealing . . . cannot expand the parties' substantive duties under a contract; rather, it relates to the performance of the contract. *See Zygar v. Johnson*, 169 Ore. App. 638, 646, 10 P.3d 326 (2000), *rev den*, 331 Ore. 584, 19 P.3d 356 (2001) (a party's duty of good faith in the performance of a contract cannot contradict an express contractual term nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract). Thus, **the duty of good faith and fair dealing**--which serves to effectuate the objectively reasonable expectations of the parties--**may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue**; indeed, the reasonable expectations of the parties are irrelevant if the parties have agreed to an express term governing the issue.

*Gibson v. Douglas County*, 197 Or. App. 204, 217 (2005) (emphasis supplied; some citations omitted).

Robinson's claim fails for two independent reasons. First, renewal of the parties' franchise relationship was governed by the express renewal provisions of the 2004 Franchise

Page 26 - OPINION AND ORDER

Agreement, such that a claim for breach of the implied covenant will not lie under Oregon law. Second, for reasons discussed at length above, Robinson could have had no objectively reasonable expectation of entitlement to renewal of the franchise agreement on *any* terms, let alone on the same terms that permitted him to continue operating the Robinson Animal Hospital during the initial term of the franchise. In consequence, Robinson cannot state a claim for breach of the implied covenant. For the same reasons adduced above in connection with Robinson's breach of contract claim, the deficiencies in his claim cannot be cured by amendment, and the claim for breach of the implied covenant (the third count of Robinson's first enumerated claim for relief) is dismissed with prejudice.

**V.    Robinson's Claim for Intentional Interference with Economic Relations**

Robinson takes the position that, by imposing purportedly improper conditions on its consent to renewal of the 2004 Franchise Agreement, defendants intentionally interfered with his economic relations with the customers and clients of the Knoxville franchise. Under Oregon law:

> To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages.

*Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1999), *citing McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). "Deliberate interference alone does not give rise to tort liability." *Id.*; *see also Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209-210 (1973) ("[A] claim [of tort liability for intentional interference with economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of

Page 27 - OPINION AND ORDER

the interference itself. Defendant's liability may arise from improper motives or from the use of

improper means. They may be wrongful by reason of a statute or other regulation, or a

recognized rule of common law, or perhaps an established standard of a trade or profession.").

The *Northwest Natural Gas* court specified that:

> To be entitled to reach a jury, a plaintiff must not only prove that defendant[s]
> intentionally interfered with [its] business relationship but also that defendant had
> a duty of non-interference; *i.e.*, that [they] interfered for an improper purpose
> rather than for a legitimate one, or that defendant[s] used improper means which
> resulted in injury to plaintiff. Therefore, a case is made out which entitles
> plaintiff to go to a jury only when interference resulting in injury to another is
> wrongful by some measure beyond the fact of the interference itself.

*Northwest Natural Gas*, 328 Or. at 498 (citations, internal quotation marks omitted). The court

further explained that:

> [I]f liability in tort is to be based on an actor's purpose, then the purpose must be
> to inflict injury on the plaintiff "as such." And, if liability in tort is based on an
> actor's means, then the means must violate some objective, identifiable standard,
> such as a statute or other regulation, or a recognized rule of common law, or,
> perhaps, an established standard of a trade or profession.

*Id.* (citations omitted). Under Oregon law, therefore, a third-party's interference with another

party's economic relations is not improperly motivated when its purpose is the pursuit of the third

parties' own interests. *See, e.g., Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224,

238 (2006) ("not improper" for a corporate party's actions to be motivated to maximize its

profits); *Top Service*, 283 Or. at 212 (not improper for a party to be motivated to pursue its own

business purposes "as it saw them").

Moreover:

> "Improper purpose" in interference with economic relations cases (sometimes
> referred to as "improper motive") is analyzed under Oregon law by reference to
> certain provisions of the *Restatement (Second) of Torts* (1974). *See, e.g., Uptown
> Heights Associates v. Seafirst Corp.*, 320 Ore. 638, 653, 891 P.2d 639 (1995)

(referring to *Restatement* at § 766); *Top Service Body Shop v. Allstate Ins. Co.*, 283 Ore. 201, 206-10, 582 P.2d 1365 (1978) (referring to section 766 of the original Restatement of Torts (1939) as well as to sections 766, 776B, and 767 of the tentative draft of the *Restatement (Second)* concerning "improper motives" and "improper means"). While *Restatement* section 766 generally describes the components of the tort, section 768 specifically concerns intentional interference with business relations when the parties are business competitors. Section 768(1) provides:

> "One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> "(a)  the relation concerns a matter involved in the competition between the actor and the other and
>
> "(b) the actor does not employ wrongful means and
>
> "(c) his action does not create or continue an unlawful restraint of trade and
>
> "*(d) his purpose is at least in part to advance his interest in competing with the other*."

(Emphasis added.)  Comment g to section 768 amplifies subsection (d):

> "The rule stated in this Section developed to advance the actor's competitive interest and the supposed social benefits arising from it. *If his conduct is directed, at least in part, to that end, the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper.* But if his conduct is directed solely to the satisfaction of his spite or ill will and not at all to the advancement of his competitive interests over the person harmed, his interference is held to be improper."

(Emphasis added.)

*Douglas Med. Ctr. LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 630-631 (2006) (footnote omitted; emphasis original).  By contrast, where the parties to an intentional interference with economic relations claim are not business competitors, the improper purpose requirement is

satisfied where the interfering party's motive is in part improper, without regard to whether that party's motive is, in addition, in part to advance that party's own business interests. *See, e.g., Top Service*, 283 Or. at 209-211; Restat 2d. of Torts, § 766.

> Notwithstanding the foregoing:
>
> When a party invokes an express contractual remedy in circumstances specified in the written contract -- conduct that reflects, by definition, the reasonable expectations of the parties -- that party cannot be liable for intentional interference with economic relations based solely on that party's reason for invoking the express contractual remedy. That is because, if the defendant has interfered with the plaintiff's economic relations, the defendant has done so for a "legitimate" purpose, *Straube* [*v. Larson*], [287 Or. 357,] 361 [(1979)] -- invocation of an express, written contractual remedy -- in such circumstances.

*Uptown Heights Assocs. Ltd. Partnership v. Seafirst Corp.*, 320 Or. 638, 651-652 (1995).

As pled in his Amended Complaint, Robinson's theory of defendants' intentional interference is premised solely on defendants' purportedly "wrongful conduct" -- that is to say, improper means -- in failing to renew the Knoxville franchise, in assuming ownership and operation thereof following the expiration of the initial ten-year term of the parties' agreement, and in forming relationships with the then-existing customers of the franchise. *See* Amended Complaint, ¶ 63; *see also id.* at ¶ 65. In his briefing in opposition to defendants' motion to dismiss and at oral argument in connection therewith, Robinson additionally argued that in so doing defendants acted with improper purpose, namely the purpose(s) of increasing the profitability of their business enterprises generally and of eliminating the Banfield franchise program in particular in order to capture the profits therefrom for themselves.

Because Robinson does not plead it, this court arguably is under no obligation to consider Robinson's theory of improper purpose in evaluating the merits of defendants' motion. *See, e.g., Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968-969 (9th Cir. 2006). However, I note that

Page 30 - OPINION AND ORDER

it would be futile to permit Robinson to amend his complaint a second time to allege defendants' improper purpose. It is clear that Robinson and the defendants are business competitors, and it is Robinson's express position that defendants' purportedly improper purpose has been – at least in part but apparently in its entirety – to increase its own profits at Robinson's expense, including by eliminating the Banfield franchise program. Not only is the elimination of the franchise program a proper purpose both for refusing to renew and for taking over a franchise and its customers as expressly provided for in the parties' agreement, and not only is profit-seeking a proper purpose as a matter of law among business competitors, but also, as discussed above, even where profit-seeking constitutes only a component of a business-competitor's purpose, the effect of its presence is to render nugatory any additional, otherwise improper animus for purposes of the tort. *See Eusterman*, 204 Or. App. at 238; *Top Service*, 283 Or. at 212; *Douglas Med. Ctr.*, 203 Or. App. at 630-631. As a matter of law, therefore, Robinson cannot establish defendants' actionably improper purpose underlying their complained-of conduct.

As to Robinson's theory of improper means, as discussed at length above defendants' conduct in refusing to renew the Knoxville franchise was, under the circumstances, proper and permitted under the parties' contract, and Robinson's claim cannot survive on the basis of defendants' refusal to renew. Also as discussed above, the parties' agreement expressly provided that defendants would have the right to assume ownership and operation of the former Knoxville franchise following expiration of its term, and therefore defendants' conduct in so doing similarly cannot support Robinson's tort claim. *See Uptown Heights*, 320 Or. at 651-652. Finally, defendants' conduct in forming relationships with the customers of the former Knoxville franchise after assuming ownership and operation thereof is patently not improper in light of the

Page 31 - OPINION AND ORDER

provisions affording defendants the express right to begin operating the former franchise after expiration of the parties' agreement. In consequence, Robinson has likewise failed to allege improper conduct sufficient to state a claim for intentional interference.

Because Robinson's theory of improper means is premised on the inaccurate proposition that defendants breached the parties' agreement by conditioning renewal of the Knoxville franchise on Robinson's compliance with the non-competition provisions of the 2014 Charter Practices Agreement, and because Robinson expressly concedes that defendants' purpose was at least in part to increase its own profits, the deficiencies in Robinson's claim cannot be cured by amendment. Robinson's intentional interference claim is therefore dismissed with prejudice.

## VI.    Robinson's So-Styled "Claim" for Disregard of Defendants' Corporate Formalities

As noted above, disregard of corporate formalities, or piercing the corporate veil, is a mechanism for recovery of damages, and is not an independent cause of action. Because, for reasons discussed above, Robinson's pleading does not otherwise state any claim for relief, it is unnecessary to consider the "claim" for disregard.[5] To whatever extent Robinson intended the so-styled claim for disregard of defendants' corporate formalities to state a claim for relief, it is therefore dismissed with prejudice.

## VII.    Robinson's Prayer for Damages

Because Robinson's pleading does not state a claim for relief, it is unnecessary to consider defendants' alternative motion to strike his prayer for damages. The alternative motion is therefore denied as moot.

---

[5] Robinson expressly concedes that this "claim" is "premature" at this stage of these proceedings.

Page 32 - OPINION AND ORDER

## CONCLUSION

For the reasons set forth above, defendants' motion (#31) to dismiss is granted in its entirety, each of Robinson's claims is dismissed with prejudice, and defendants' alternative motion to strike is denied as moot.

Dated this 16th day of April, 2015.

Honorable Paul Papak
United States Magistrate Judge